SUSAN Z. MCNAMARA ET AL. *v.* TOURNAMENT PLAYERS CLUB OF CONNECTICUT, INC., ET AL.
(SC 17098)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

---

Argued March 8—officially released July 20, 2004

*John R. Williams*, for the appellants (plaintiffs).

*Charles D. Ray*, with whom, on the brief, were *William H. Narwold* and *Ingrid I. Moll*, for the appellee (named defendant).

*Opinion*

BORDEN, J. The plaintiffs, Susan Z. McNamara and Brian P. McNamara, appeal[1] from the judgment of the

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

trial court rendered in favor of the named defendant, the Tournament Players Club of Connecticut, Inc.[2] The plaintiffs claim that the trial court improperly: (1) granted summary judgment for the defendant without affording the plaintiffs a fair opportunity to respond; (2) granted summary judgment for the defendant on the plaintiffs' claims of negligent infliction of emotional distress; and (3) granted summary judgment for the defendant on the statutory claims of Susan Z. McNamara. We affirm the judgment of the trial court.

The following somewhat complicated procedural history is necessary to an understanding of this case. Certain facts are undisputed and are as follows: The plaintiffs are husband and wife. On July 17, 1999, Brian P. McNamara was a member of a golf club, owned by the defendant, known as the Tournament Players Club at River Highlands (club). On that date, he and another male member became involved in a verbal dispute in or near the club's locker room. As a result, the defendant cancelled both men's memberships and refunded their initiation fees to them on a prorated basis. In October, 1999, Susan Z. McNamara applied for membership in the club. The club denied her application in writing, according to the plaintiffs' complaint, "because, and only because, she is a woman who is married to the plaintiff Brian McNamara." If she had been admitted to the club, her spouse would have had the use of the club's facilities from which he previously had been banned.

Thereafter, the plaintiffs brought this action. After various preliminary rulings, none of which is at issue

[2] Originally, the PGA Tour Construction Services, Inc., was named as a defendant in this case. The trial court, *Gilardi, J.*, granted that defendant's motion to dismiss the claims against it on the basis of lack of personal jurisdiction. The plaintiffs do not challenge that ruling in this appeal. We refer herein to the Tournament Players Club of Connecticut, Inc., as the defendant.

in this appeal,[3] the plaintiffs filed an amended complaint containing six counts, four on behalf of Susan Z. McNamara and two on behalf of Brian P. McNamara. The four counts on behalf of Susan Z. McNamara alleged: (1) negligent infliction of emotional distress; (2) discrimination by a golf country club in violation of General Statutes § 52-571d;[4] (3) discrimination in violation

[3] Although these preliminary rulings are not challenged in the present appeal, we note them briefly because they bear on the propriety of the later rulings by the trial court that are involved in this appeal. In September, 2001, the trial court, *Gilardi, J.,* ruled on the defendant's multipart motion to dismiss or, in the alternative, to strike certain counts in the plaintiffs' original complaint. In that motion, the defendant had moved to strike three of the counts on behalf of Susan Z. McNamara, in which she had alleged that the defendant had denied her application " 'because, and only because, she is a woman who is married to the plaintiff Brian McNamara.' " Construing those counts as alleging gender discrimination in violation of General Statutes §§ 46a-58, 46a-64 and 52-571d, and construing them favorably to the plaintiffs, as the court was required to do on a motion to strike, the court ruled that they "ma[d]e out a sufficient claim of gender discrimination." At the same time, however, the court expressed doubt that Susan Z. McNamara had sufficiently alleged a claim of marital status discrimination.

[4] General Statutes § 52-571d provides: "(a) For the purposes of this section, 'golf country club' means an association of persons consisting of not less than twenty members who pay membership fees or dues and which maintains a golf course of not less than nine holes and (1) receives payment for dues, fees, use of space, facilities, services, meals or beverages, directly or indirectly, from or on behalf of nonmembers or (2) holds a permit to sell alcoholic liquor under chapter 545.

"(b) No golf country club may deny membership in such club to any person on account of race, religion, color, national origin, ancestry, sex, marital status or sexual orientation.

"(c) All classes of membership in a golf country club shall be available without regard to race, religion, color, national origin, ancestry, sex, marital status or sexual orientation.

"(d) A golf country club that allows the use of its facilities or services by two or more adults per membership, including the use of such facilities or services during restricted times, shall make such use equally available to all adults entitled to use such facilities or services under that membership. The requirements of this subsection concerning equal access to facilities or services of such club shall not apply to adult children included in the membership. Nothing in this subsection shall be construed to affect the assessment by a golf country club of any fees, dues or charges it deems appropriate, including the ability to charge additional fees, dues or charges for access by both adult members during restricted times.

"(e) A golf country club that has food or beverage facilities or services shall allow equal access to such facilities and services for all adults in all

of General Statutes § 46a-58 (a);[5] and (4) discrimination
in violation of General Statutes § 46a-64.[6] The two

membership categories at all times. Nothing in this subsection shall be
construed to require access to such facilities or services by any person if
such access by such person would violate any provision of the general
statutes or a municipal ordinance concerning the sale, consumption or
regulation of alcoholic beverages.

"(f) Nothing in this section shall be construed to prohibit a golf country
club from sponsoring or permitting events that are limited to members of
one sex if such club sponsors or permits events that are comparable for
members of each sex.

"(g) Any person aggrieved by a violation of the provisions of this section
may bring a civil action in the Superior Court to enjoin further violations
and to recover the actual damages sustained by reason of such violation or
two hundred fifty dollars, whichever is greater, together with costs and a
reasonable attorney's fee.

"(h) If, in an action brought under subsection (g) of this section, the court
finds that a golf country club holding a permit to sell alcoholic liquor under
chapter 545 has violated any of the provisions of this section, it may, in
addition to any relief ordered under said subsection (g), order the suspension
of such permit until such time as it determines that such club is no longer
in violation of this section. The plaintiff shall send a certified copy of such
order to the Department of Consumer Protection. Notwithstanding the provi-
sions of sections 4-182 and 30-55, the department shall, upon receipt of
such order, suspend such permit in accordance with such order. Upon
determination by the court that such club is no longer in violation of this
section, such club shall send a certified copy of such determination to the
department and the department shall reinstate such permit."

[5] General Statutes § 46a-58 (a) provides: "It shall be a discriminatory prac-
tice in violation of this section for any person to subject, or cause to be
subjected, any other person to the deprivation of any rights, privileges or
immunities, secured or protected by the Constitution or laws of this state
or of the United States, on account of religion, national origin, alienage,
color, race, sex, blindness or physical disability."

[6] General Statutes § 46a-64 provides: "(a) It shall be a discriminatory prac-
tice in violation of this section: (1) To deny any person within the jurisdiction
of this state full and equal accommodations in any place of public accommo-
dation, resort or amusement because of race, creed, color, national origin,
ancestry, sex, marital status, age, lawful source of income, mental retarda-
tion, mental disability or physical disability, including, but not limited to,
blindness or deafness of the applicant, subject only to the conditions and
limitations established by law and applicable alike to all persons; (2) to
discriminate, segregate or separate on account of race, creed, color, national
origin, ancestry, sex, marital status, age, lawful source of income, mental
retardation, mental disability, learning disability or physical disability,
including, but not limited to, blindness or deafness; (3) for a place of public
accommodation, resort or amusement to restrict or limit the right of a
mother to breast-feed her child; (4) for a place of public accommodation,
resort or amusement to fail or refuse to post a notice, in a conspicuous

counts on behalf of Brian P. McNamara alleged: (1) negligent infliction of emotional distress; and (2) dis-

place, that any blind, deaf or mobility impaired person, accompanied by his guide dog wearing a harness or an orange-colored leash and collar, may enter such premises or facilities; or (5) to deny any blind, deaf or mobility impaired person or any person training a dog as a guide dog for a blind person or a dog to assist a deaf or mobility impaired person, accompanied by his guide dog or assistance dog, full and equal access to any place of public accommodation, resort or amusement. Any blind, deaf or mobility impaired person or any person training a dog as a guide dog for a blind person or a dog to assist a deaf or mobility impaired person may keep his guide dog or assistance dog with him at all times in such place of public accommodation, resort or amusement at no extra charge, provided the dog wears a harness or an orange-colored leash and collar and is in the direct custody of such person. The blind, deaf or mobility impaired person or person training a dog as a guide dog for a blind person or a dog to assist a deaf or mobility impaired person shall be liable for any damage done to the premises or facilities by his dog. For purposes of this subdivision, 'guide dog' or 'assistance dog' includes a dog being trained as a guide dog or assistance dog and 'person training a dog as a guide dog for a blind person or a dog to assist a deaf or mobility impaired person' means a person who is employed by and authorized to engage in designated training activities by a guide dog organization or assistance dog organization that complies with the criteria for membership in a professional association of guide dog or assistance dog schools and who carries photographic identification indicating such employment and authorization.

"(b) (1) The provisions of this section with respect to the prohibition of sex discrimination shall not apply to (A) the rental of sleeping accommodations provided by associations and organizations which rent all such sleeping accommodations on a temporary or permanent basis for the exclusive use of persons of the same sex or (B) separate bathrooms or locker rooms based on sex. (2) The provisions of this section with respect to the prohibition of discrimination on the basis of age shall not apply to minors or to special discount or other public or private programs to assist persons sixty years of age and older. (3) The provisions of this section with respect to the prohibition of discrimination on the basis of physical disability shall not require any person to modify his property in any way or provide a higher degree of care for a physically disabled person, including, but not limited to blind or deaf persons, than for a person not physically disabled. (4) The provisions of this section with respect to the prohibition of discrimination on the basis of creed shall not apply to the practice of granting preference in admission of residents into a nursing home as defined in section 19a-490, if (A) the nursing home is owned, operated by or affiliated with a religious organization, exempt from taxation for federal income tax purposes and (B) the class of persons granted preference in admission is consistent with the religious mission of the nursing home. (5) The provisions of this section with respect to the prohibition of discrimination on the basis of

crimination on the basis of ethnicity in violation of § 52-571d.

On February 3, 2003, after the case had been assigned for trial, the defendant moved for permission to file a motion for summary judgment, alleging that it just recently had completed discovery after efforts to obtain documents and to depose the plaintiffs had been delayed by the plaintiffs. In its proposed motion and supporting papers, the defendant asserted that both plaintiffs, in deposition testimony, had admitted "facts which are dispositive of every cause of action they have asserted . . . ." The defendant argued as follows regarding the claims of Susan Z. McNamara. As to her marital status discrimination claim, her allegations were based, not on her marital status, namely, being single, married, separated, divorced or widowed, but on the identity of her spouse, and, therefore, were not within the contemplation of the various discrimination statutes on which she relied. Further in this regard, the defendant brought forth evidence that, as a factual matter, the plaintiffs had admitted in their depositions that Susan Z. McNamara had been denied membership only because of the identity of her spouse, namely, Brian P. McNamara, and not because of her gender or her marital status, and that she would have been granted membership if she had been married to someone else. Finally, the defendant brought forth evidence that the plaintiffs also had admitted in their depositions that the club never had refused an application from a woman, that many of its members were women, that many of those women were married, and that there was no discriminatory atmosphere toward women at the club.

---

lawful source of income shall not prohibit the denial of full and equal accommodations solely on the basis of insufficient income.

"(c) Any person who violates any provision of this section shall be fined not less than twenty-five nor more than one hundred dollars or imprisoned not more than thirty days or both."

Regarding the plaintiffs' emotional distress claims, the defendant argued that: the plaintiffs had failed to allege or establish any negligent conduct by the club; there was no breach of duty by the club to Susan Z. McNamara because the only act complained of was the written notification of the rejection of her application, which did not meet the legal requirement that the club's conduct be so egregious that it should have realized that it was creating a risk of causing emotional distress; and, based on the plaintiffs' deposition testimony, answers to interrogatories, and discovery responses, the plaintiffs had failed to raise a genuine issue of material fact that they had suffered any emotional distress as a result of the club's rejection letter. On February 4, 2003, the trial court, *Gordon, J.*, denied the defendant's motion for permission to file the summary judgment motion because of its lateness and because jury selection was scheduled to begin on the case.

Jury selection began on March 4, 2003. After the third venireperson had been excused, the trial court, *Gordon, J.*, reconsidered its decision regarding the defendant's filing of the motion for summary judgment. At that point, a lengthy and, at times, somewhat confusing colloquy took place among the court and counsel[7] regarding the motion for summary judgment. The court noted that it "had just read through" the summary judgment motion, and asked the plaintiffs' counsel if he had read it. He responded in the negative, but asked the court for the opportunity to review it. The court then stated that it would recess at noon to "give everybody a chance to get ready . . . ." The court then asked the plaintiffs' counsel, "how much time do you need to prepare to

---

[7] Although counsel for the plaintiffs was an associate in the law firm representing the plaintiffs, apparently he was in court on that day because the attorney who had drafted the complaint and many of the other pleadings in the case, John R. Williams, was on trial elsewhere, and another attorney from the same law firm who was familiar with the case, Dawne Westbrooke, was on vacation.

argue the motion?" The plaintiffs' counsel replied that he would need "fifteen, twenty minutes to go through the briefs and then take another, say that amount of time to look through the depositions . . . ." The court then stated: "Well, I'd give you more time than that. Why don't we do this. . . . Rather than continue with this? . . . Why don't we take [until], is 12:15 enough time?" The plaintiff's counsel replied: "I think it should be . . . ." The court then stated: "All right. If it's not, at 12:15 . . . we'll argue it, and that way, if the case is going to get bounced on the law, if [the plaintiffs] don't have a discrimination claim, if they don't have a marital discrimination claim . . . then we may as well let the jury go . . . [and] your client[s] [do not] have to come and then they can just go straight to their appeal if they want to take an appeal . . . ." The plaintiffs' counsel replied: "Well . . . if it looks like it's going to get bounced on a directed verdict anyway, then we might as well save it and litigate the issue [in the] Appellate Court." The court then recessed.

Upon resuming after the recess, the court asked the plaintiffs' counsel: "Do you need some more time?" The plaintiffs' counsel replied, "Just a couple [of] seconds . . . Your Honor." The court then heard the arguments of the defendant's counsel on the merits of the summary judgment motion. Those arguments addressed all of the plaintiffs' claims, including: Susan Z. McNamara's gender and marital status discrimination claims; Brian P. McNamara's ethnicity discrimination claim; and both plaintiffs' negligent infliction of emotional distress claims.

The plaintiffs' counsel then stated: "Before, I . . . review some of the facts, I feel almost a little at a loss; I didn't call the office to see if we'd ever prepared a response to the summary judgment, proposed summary judgment motion." The court replied: "[W]ould you like to?" The plaintiffs' counsel replied that "I do understand

the . . . disputes in this case . . . ." The court then stated: "[I]f you want to write something, I'll be glad to hold this over [until] tomorrow . . . if you want to put something together, that's fine." The plaintiffs' counsel replied that he "would actually feel a little more comfortable doing so only because there are a few issues in here that I want to make sure I have thoroughly prepared . . . the negligent infliction law I'm well acquainted with. I am well acquainted with [§ 52-571d] . . . . The general law on marital status, I know; I'd just feel a little more comfortable if I had [something] in writing I can present to Your Honor . . . ." When the court asked the plaintiffs' counsel whether the facts were in dispute, he replied that "I do have a couple [of] distinctions in fact . . . to opposing counsel." When the court asked, "Why don't you let me know what those are," the plaintiffs' counsel replied with a detailed discussion related solely to the claim of Brian P. McNamara of discrimination based on ethnicity. This was followed by a very brief reference by the plaintiffs' counsel on the law regarding negligent infliction of emotional distress.

The court then asked the plaintiffs' counsel to "tell me about the . . . marital status [discrimination] issue . . . ." The plaintiffs' counsel replied that "the claim here that we made was that [Susan Z.] McNamara applies and is denied because she's married to [Brian P.] McNamara. . . . And so that was . . . how . . . the complaint was drafted." When the court responded that "that's just . . . who her partner is," the plaintiffs' counsel replied that, according to his understanding of the law of marital status discrimination, "the general law on marital status . . . talk[s] about . . . if someone's discriminated because they're married . . . it's not because of who you're married to, is what I understand . . . the general law on that to be."

The court then stated: "*[I]t seems that* [Susan Z.] McNamara's claims are out, because I don't think marital status or gender are covered. *I don't think there's any intentional infliction of emotional distress*, and I don't think he has a separate action for negligent infliction of emotional distress." (Emphasis added.) The court then stated that Brian P. McNamara "might . . . still have, a case for . . . discrimination based on ethnicity . . . ." The court indicated that Brian P. McNamara had "more counts in that," whereupon the plaintiffs' counsel acknowledged that "[t]here were more, but I think those are what it boiled down to," and the plaintiffs' counsel then agreed with the court that the other counts of Brian P. McNamara were "repetitive" of his ethnicity discrimination claim.

The court then stated: "So we can go through them; but *it seems to me* that everything else is going to go except for [Brian P. McNamara's ethnicity discrimination claim], and I'm not even sure about that; but what I'd like to do is give you the opportunity until tomorrow morning at 10 to just come back on that issue." (Emphasis added.) The plaintiffs' counsel replied: "Okay, Your Honor."

The court then stated: "*So let's make the preliminary ruling that the rest of the case, let me go through them, just.*" (Emphasis added.) The defendant's counsel then offered further argument on Brian P. McNamara's ethnicity discrimination claim, and the court asked the plaintiffs' counsel: "Do you want until tomorrow to actually write something on this?" The plaintiffs' counsel responded that, "to protect my client's interests . . . I would ask for 10 o'clock tomorrow morning . . . to have something in writing before you." The court responded: "Right."

The court then revisited the defendant's summary judgment motion. The court stated as follows: "Count

two is Susan McNamara's claim for negligent infliction of emotional distress. The court does not find that there . . . was actionable behavior. This being a private club they can accept or reject membership without fear of a negligent infliction of emotional distress claim unless you're protected under one of the other classes which is statutorily carved out . . . ."[8] The court then addressed Susan Z. McNamara's three statutory claims and rejected them as insufficient because they were based solely on "her choice of . . . marital partner . . . ."

This left only Brian P. McNamara's two claims, namely, his claim for negligent infliction of emotional distress, and his claim for discrimination based on ethnicity. The court rejected the first claim "for the same reasons that" Susan Z. McNamara's claims were rejected, namely, that there was no actionable behavior by the defendant. Regarding the second claim, on which Brian P. McNamara claimed only the equitable remedy of reinstatement to the club, the court stated that "we'll take this up at 10 o'clock tomorrow morning," without the necessity of a jury. The court stated to the plaintiffs' counsel that he could present his written response at that time.

The court convened the next morning on March 5, 2003. A lengthy hearing ensued on Brian P. McNamara's remaining claim of discrimination based upon ethnicity, including both oral argument and testimony. Ultimately, on March 10, 2003, Brian P. McNamara withdrew that claim.[9] The court subsequently rendered judgment in favor of the defendant "as to all counts claimed to the jury." This appeal followed.

---

[8] The court added that Susan Z. McNamara had not shown any emotional distress. The court stated: "We just have her saying she was kind of upset, that she was going through a lot of things at the time. So, but anyway, the action doesn't really lie anyway . . . ."

[9] Therefore, that claim is not before us in any way in the present appeal.

The plaintiffs first claim that the trial court improperly granted the defendant's summary judgment motion "without affording the plaintiffs a fair opportunity to respond." This claim challenges the summary judgment on the following counts: (1) Susan Z. McNamara's claims of negligent infliction of emotional distress, discrimination by a golf country club in violation of § 52-571d, discrimination in violation of § 46a-58 (a), and discrimination in violation of § 46a-64; and (2) Brian P. McNamara's claim of negligent infliction of emotional distress.

The plaintiffs' claim comes to us in two parts. The first is a legal claim, namely, that, based upon the decision of the Appellate Court in *Krevis* v. *Bridgeport*, 64 Conn. App. 176, 779 A.2d 838 (2001), rev'd, 262 Conn. 813, 817 A.2d 628 (2003), the trial court may not, sua sponte, raise and decide a motion for summary judgment because Practice Book (2003 Rev.) § 17-45[10] "provides that no motion for summary judgment may be placed on a short calendar to be heard less than [fifteen] day[s] after the motion has been filed and that the opposing party must file opposition papers at least five days before the short calendar date." The second is a factual claim, namely, that as a matter of fact, the trial court, having sua sponte raised the motion for summary judgment, did not give the plaintiffs a fair opportunity to respond to it. We disagree with both propositions.

---

[10] Practice Book (2003 Rev.) § 17-45 provides: "A motion for summary judgment shall be supported by such documents as may be appropriate, including but not limited to affidavits, certified transcripts of testimony under oath, disclosures, written admissions and the like. The motion shall be placed on the short calendar to be held not less than fifteen days following the filing of the motion and the supporting materials, unless the judicial authority otherwise directs. The adverse party shall at least five days before the date the motion is to be considered on the short calendar file opposing affidavits and other available documentary evidence. Affidavits, and other documentary proof not already a part of the file, shall be filed and served as are pleadings."

The plaintiffs' first proposition is simply wrong on the law because we subsequently reversed the Appellate Court's judgment in *Krevis* v. *Bridgeport,* supra, 64 Conn. App. 176. In *Krevis* v. *Bridgeport,* supra, 262 Conn. 818, we held that, despite the provisions of Practice Book § 17-45, the trial court, in the exercise of its case management authority, has the discretion, as a trial is about to begin, "to decide a dispositive question of law that the parties to the case submit to the court orally, without a written motion *or compliance with certain applicable provisions of the Practice Book.*"[11] (Emphasis added.) A fortiori, the trial court in the present case had such discretion to decide, without compliance with the applicable scheduling provisions of the rules of practice regarding summary judgment motions, dispositive questions of law that had been presented in writing previously to the court but had not been ruled on because of untimeliness.

We also disagree with the plaintiffs that, as a factual matter, the procedure followed by the court in taking up and deciding the summary judgment motion deprived the plaintiffs of a fair opportunity to respond to it. This claim invokes the question, under *Krevis,* of whether the trial court abused its discretion in considering the motion for summary judgment out of the ordinary course. We conclude that the trial court did not abuse its discretion.

We first note what the plaintiffs, through their counsel, did not do. They did not, at any time during the two days of hearings, claim to the trial court that it was depriving them of a fair opportunity to respond to the defendant's summary judgment motion. They did not,

[11] We note in this regard that our decision in *Krevis* reversing the Appellate Court was issued on March 25, 2003, and the plaintiffs' brief in the present case, which relied on the Appellate Court's decision in that case, was filed in this court on July 8, 2003. The plaintiffs should have discovered this development in the law.

moreover, at any time after the court decided the motion, move for the court to reconsider its rulings. Indeed, at no time during the entire process of this appeal have the plaintiffs suggested anything, by way of testimony, documentation, or otherwise, that they would or could have adduced in response to the motion for summary judgment to undermine the propriety of any of the court's rulings on it. Although we do not suggest that a counsel, who complains on appeal of having been treated unfairly by a trial court's sua sponte consideration of a legal question, has an inviolate obligation to move for reconsideration or to supplement the appellate record, the counsel's failure to make such a supplemental effort or to voice any specific objection to the fairness of the court's procedure, either during or after that procedure, is indicative that the counsel did not regard the procedure as unfair at the time and, consequently, undermines any appellate claim to that effect.

We next focus on what the plaintiffs' counsel did do. When first asked by the court how much time he needed to review the motion, he asked for fifteen or twenty minutes and, when the court stated that it would give him more time than that, he agreed that until 12:15 p.m. would be sufficient. He also agreed with the court that, if the case were destined to be subject to a directed verdict for the defendant, "then we might as well save it and litigate the issue" on appeal. After the recess, he affirmatively stated that he needed only a few more seconds. He also stated that he understood the case, was well acquainted with the law on negligent infliction of emotional distress, on discrimination by a golf country club, and on discrimination on the basis of marital status. When asked what facts were in dispute, the only ones that he identified related to the claim of Brian P. McNamara regarding discrimination on the basis of ethnicity, which was ultimately withdrawn and is not

before us in this appeal. Further, he acknowledged that Susan Z. McNamara's claim for marital status discrimination was based solely, not on the fact that she was a married *woman*, but solely on the fact that she was married to Brian P. McNamara.

We acknowledge that the plaintiffs' counsel did, at the court's invitation, say that he would like to have the opportunity to present something in writing to the court the next morning. The court acknowledged and agreed to that request. Nonetheless, on the next morning, the plaintiffs' counsel did not file any such written response.

The plaintiffs' claim of unfair treatment, therefore, distills into the contention that, despite their counsel's request to file a written response to the motion the next morning, which the court granted, the court went ahead and decided the motion without honoring that request. We conclude, however, that a fair reading of the record discloses that the court, rather than actually deciding the motion on that day, instead issued what it regarded as a preliminary ruling on the motion that the plaintiffs' counsel was free to dispute the next day but did not. Therefore, the plaintiffs were not deprived by the trial court of a fair opportunity to respond to the summary judgment motion.

First, the trial court, when initially discussing the merits of Susan Z. McNamara's claims, did so in quite tentative terms. The court stated: that *"it seems"* that her claims of gender and marital status discrimination were "not covered" by the statutes on which she relied; that *"I don't think* [she had established] any intentional infliction of emotional distress"; and that *"it seems to me* that everything else is going to go except for" Brian P. McNamara's ethnicity discrimination claim. (Emphasis added.) The court then stated, with regard to her claims: "So, let's make *the preliminary ruling*" on

them. (Emphasis added.) It was not until after this preface, indicating that its rulings were to be regarded as preliminary and not final, that the court turned to those claims again and, although not repeating that tentative phraseology, rendered its preliminary rulings on them.

Second, we note, again, that at no time during this colloquy, or the next morning when the case resumed on the remaining claim of Brian P. McNamara, or at any time while the case was still in the trial court, did the plaintiffs' counsel claim that he had been deprived of a fair opportunity to respond to the summary judgment motion. This is powerful evidence that he, too, understood the court's initial rulings to be preliminary and remaining subject to challenge by him the next day. Furthermore, as we have indicated, to this day the plaintiffs have not suggested any supplemental factual material that might have been offered the next day, or thereafter.

The plaintiffs next claim that, even if its procedure were permissible, the trial court improperly granted summary judgment for the defendant on the plaintiffs' claims of negligent infliction of emotional distress. The plaintiffs read the trial court's ruling on these claims as "boil[ing] down to two points: (1) the defendant is a private club and a private club can do anything it likes to people without being sued for the negligent infliction of emotional distress; [and] (2) a negligent infliction of emotional distress claim will not lie absent expert medical testimony and the plaintiffs had not disclosed an expert physician in the case." We do not read the bases of the court's decision in such a cramped manner, especially considering the summary judgment papers that the court had before it.

With respect to the claims of negligent infliction of emotional distress, we agree with the defendant that the only act of negligence by the defendant on which

the plaintiffs have relied was the club's act in sending Susan Z. McNamara the letter of rejection of her application for membership.[12] "In order to recover on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) *Gomes* v. *Commercial Union Ins. Co.*, 258 Conn. 603, 619, 783 A.2d 462 (2001). There was no basis for a rational inference that the sending of the rejection letter under these circumstances conceivably could have met this standard. The trial court's granting of the defendant's motion for summary judgment on these claims, therefore, was justified.

The plaintiffs' final claim is that the trial court improperly granted summary judgment for the defendant on Susan Z. McNamara's gender discrimination claims because the trial court considered the counts containing those claims solely as marital status claims. We note first, however, that Susan Z. McNamara never asked the trial court to rule specifically on her gender discrimination claim, separately from her marital status claim. We regard its ruling, therefore, as implicitly rejecting her gender discrimination claim as well. Furthermore, contrary to her wholly conclusory assertion that "[t]he evidence, construed in the light most favorable to the plaintiffs, as it should have been . . . was sufficient to permit a jury determination that (a) the defendant was not really a private club at all and (b) [Susan Z. McNa-

---

[12] There was no claim that the wording of the letter of rejection was in any way inflammatory, humiliating or otherwise inappropriate. In fact, the letter itself was attached as an exhibit to the motion, along with Susan Z. McNamara's deposition testimony regarding it, and they both support this conclusion. The letter simply informed her that, because all memberships included family privileges, and because the club recently had rescinded her husband's membership and refunded his initiation fee, "the Membership Committee cannot accept your application for membership."

mara] would not have been denied membership had she been a man," we conclude that there was no such evidence, and that the only evidence adduced on the motion for summary judgment showed convincingly that there was no gender discrimination.

The plaintiffs alleged that Susan Z. McNamara's application had been denied solely because she was married to Brian P. McNamara. Susan Z. McNamara testified in her deposition that there was no discriminatory atmosphere toward women at the club, that the club had denied her application because she was married to Brian P. McNamara, and that she would have been admitted had she been married to someone else. Brian P. McNamara testified that she would have been admitted had she been married to someone else because the club had "never refused" an application by a woman. It is clear, therefore, that the denial of her application was based on her status as Brian P. McNamara's spouse, and had nothing to do with her gender.

The judgment is affirmed.

In this opinion the other justices concurred.